MICHAEL RICCIO v. THE MAYOR AND COUNCIL OF THE CITY OF HOBOKEN.

Argued February Term, 1903—Decided March 30, 1903.

1. In so far as the legislature relegates to the various municipalities of the state the management and support of free public schools within their borders, that subject becomes part of the internal affairs of the respective municipalities; and a law, which 'confers the same powers and imposes the same duties respecting that subject upon any constitutional class of municipalities, is general in the constitutional sense.

2. "An act to establish a system of public instruction," approved March 26th, 1902 (*Pamph. L., p.* 69), is not rendered unconstitutional by the fact that its provisions respecting the support and management of free public schools in cities differ from its provisions on that subject in other municipalities.

On *certiorari.*

Before Justices DIXON, GARRISON and SWAYZE.

For the prosecutor, *Francis H. McCawley.*

Contra, *Thomas N. McCarter,* attorney-general.

The opinion of the court was delivered by

DIXON, J.   In pursuance of a resolution of the board of education of the city of Hoboken and of a determination by the board of school estimate, the mayor and council of the city in October last adopted an ordinance providing for the issue of city bonds to the amount of $130,000 to meet the expense of purchasing land and erecting thereon a new schoolhouse.   These proceedings are based on the "Act to establish a system of public instruction," approved March 26th, 1902, and their legality is now assailed on the ground that that act is unconstitutional.

The pertinent provisions of the constitution are found in article IV., section 7, the sixth paragraph of which requires

the legislature "to provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in this state between the ages of five and eighteen years;" and the eleventh paragraph of which forbids the legislature to pass local or special laws "regulating the internal affairs of towns and counties," or "providing for the management and support of free public schools." These paragraphs became part of the constitution in the year 1875.

The particular objection urged against the act of 1902 is that its provisions respecting the management and support of free public schools in cities differ from its provisions on the same subject in other municipalities, and, therefore, are special.

The chief reliance of the objector is found in the opinion delivered for the Court of Errors in *Lowthorp* v. *Trenton,* 33 *Vroom* 795. That opinion, however, was deprived of much of the force otherwise attributable to it by the later decision of the same court in *Hermann* v. *Guttenberg,* 34 *Id.* 616. As a decision, the Lowthorp case is scarcely relevant, for it was only to this effect—that the mere form of municipal government cannot be coupled with population to make the basis of a statutory classification for enactments regarding the support and management of public schools. In the present case we are required to consider, not a statutory classification, but what in Hermann's case was declared to be a classification adopted by the constitution itself, according to which cities, boroughs, towns, townships and villages form distinct classes for legislation respecting their internal affairs. The present question, therefore, is whether the legislature can employ this constitutional classification in legislating for public schools.

In considering this question, attention may first be given to the paragraph of the constitution prohibiting local and special laws concerning the internal affairs of towns and counties.

If the management and support of free public schools can be included among such affairs, then the broad rule laid down in Hermann's case would fully support the position that a

law prescribing the mode in which all cities should deal with the subject, would not violate that prohibition.

It must be remembered that the constitution is a practical instrument and, therefore, an important element in its correct interpretation and construction will be found in the usages prevailing when its provisions were adopted. Examined from this point of view, it seems reasonably clear that the support and management of public schools were, previous to the year 1875, committed to the various municipalities of the state as part of their internal affairs.

As early as September, 1682, an island in the Delaware river was given by the assembly of West Jersey to the town of Burlington for the maintenance of a public school (*Grants and Concessions of New Jersey, p.* 455), and in 1693 and 1695 the inhabitants of each town within the province of East Jersey were empowered to maintain a school within the town by public tax. *Id.,* 328, 358. In 1820 the inhabitants of each township in the state were authorized to raise by tax such sum of money as the town meeting should vote, to be expended under the direction of the town committee for the education of poor children residing in the township. *Elm. Dig.* 577. In 1829 "An act to establish common schools" provided for the division of the state appropriation among the townships of the state, and the control of common schools by the township or by school districts created by the township authorities. *Pamph. L.* 1829, *p.* 105. In 1831 this act was repealed and a new statute substituted, but, although the school district was given a more independent character, the state funds were still apportioned among, and the local funds were raised by, the several townships. *Pamph. L.* 1831, *p.* 145. Similar condition were preserved in the act of 1838 (*Pamph. L., p.* 246), and continued until 1867. See *Nix. Dig.* 733. Concurrently with these general statutes, various local charters were enacted conferring upon particular cities special powers for the maintenance of public schools. In the act of 1867 (*Pamph. L., p.* 360) a system of state control was established, which, however, still recognized townships and cities as possessing special pow-

ers and duties in reference to the common schools within their borders, and in the numerous municipal charters passed between 1867 and the adoption of the constitutional amendments in 1875, will be found special provisions for particular municipalities on that subject. Indeed it may be truthfully said that, at no time prior to the adoption of the amendments of 1875, can anything be discovered in our legislative history on the subject of public education, which does not point to the support and management of common schools in cities and in other municipalities as a matter, more or less, of local concern. While the state made some provision for their support, it was confessedly inadequate, and the determination of the additional means to be furnished was treated as an internal affair of each locality, which was likewise charged with the responsibility of the proper expenditure of all the funds appropriated. Consequently, notwithstanding the general interest of the state at large in the education of its citizens, I think that the support and management of public schools may be treated by the legislature as an internal affair of the various municipalities denominated towns in this paragraph of the constitution. Certainly the education of youth concerns the local community as much as does the prosecution of those who violate the laws of the state, and an important incident of such prosecution was made by legislation an internal affair of the counties. *Passaic* v. *Stevenson,* 17 *Vroom* 173. A like power must exist in the legislature respecting schools.

If, therefore, we had to deal only with the clause requiring the internal affairs of towns to be regulated by general laws, there could be no hesitation in holding that under the Hermann case a statute providing, for each of these classes of municipalities, a different method of managing and supporting public schools, would be constitutional.

But it is urged that the clause which forbids local or special laws providing for the management and support of public schools places this subject outside of the internal affairs mentioned in the other clause, and requires it to be dealt with on a footing different from municipal classification; other-

wise, it is argued, the school clause is rendered meaningless, as mere tautology. This argument has, however, but little force in the construction of fundamental laws. Professor Story justly said: "Another rule of interpretation of the constitution * * * is, that the natural import of a single clause is not to be narrowed, * * * simply because there is another clause * * * which might otherwise be deemed * * * within its scope," and he quotes from the *Federalist* that "tautologies * * * are to be ascribed, sometimes to the purposes of greater caution, sometimes to the imperfection of language, and sometimes to the imperfection of man himself." 1 *Story Com. Con.*, § 449. But on closer examination it will be perceived that the view above favored by us does not reduce the school clause to a pleonasm.

The education of children is a matter which concerns the state at large, as well as the local community in which they dwell, and may therefore reasonably be regarded in either aspect. As a concern of the local community, it falls within the clause for the regulation of internal affairs, while as a concern of the whole state it falls within the other clause. The legislature has dealt with it from both points of view. The state appropriations treat it as involving the good of the state, while the local provisions treat it as of narrower moment. But in either aspect the laws relating to it are required by the constitution to be general, and what we are now deciding is simply that legislation treating it as a matter of local concern is general, if it applies to every member of any single class of municipalities as defined by the constitution.

The decision in Hermann's case seems to afford direct support for this conclusion. Beside the inhibition of special and local laws for regulating the internal affairs of towns and counties, stands the inhibition of such laws for laying out, opening, altering and working highways; but in the case cited the law under consideration was one relating to street improvements and limited to towns, *eo nomine*. Nevertheless, that law was maintained as general, because it applied to an entire constitutional class. By parity of reasoning, a law relating to the support and management of public schools will

be general, if it applies to such a class. See, also, *Lewis* v. *Jersey City,* 37 *Vroom* 582, and *Allison* v. *Corker,* 38 *Id.* 596.

There remains to be noticed the sixth paragraph of the constitution above cited, enjoining upon the legislature the duty of providing a thorough and efficient system of free public schools for the instruction of all the children of the state between specified ages. While this clause is mandatory, it is not prohibitive. It points out the object at which the legislature should aim, but it does not invalidate efforts that fall short of the desired result. If the system devised be inefficient and partial, this clause will not render it utterly abortive. Alongside of this imperative duty to enact a perfect and universal system, there still remains the power to do that which, although inadequate, is useful. This constitutional duty does not interfere with the validity of a general law which deals with free public schools as state institutions, or which authorizes any constitutional class of municipalities to deal with them as local institutions.

Our conclusion is that there is no sufficient reason given for holding the statute unconstitutional, and the proceedings under review should therefore be affirmed, with costs.