118 N.J. Super. 223 (1972)
287 A.2d 187
KENNETH ROBINSON, AN INFANT BY HIS PARENT AND GUARDIAN AD LITEM, ERNESTINE ROBINSON AND ERNESTINE ROBINSON, INDIVIDUALLY; PAUL JORDAN, ARTHUR DWYER, FRANK H. BLATZ, AND WILLIAM S. HART. INDIVIDUALLY AND AS MAYORS RESPECTIVELY OF JERSEY CITY, PATERSON, PLAINFIELD AND EAST ORANGE; THE CITIES OF JERSEY CITY, PATERSON, PLAINFIELD AND EAST ORANGE; THE BOARDS OF EDUCATION OF THE SCHOOL DISTRICTS OF JERSEY CITY, PATERSON, PLAINFIELD AND EAST ORANGE; THE BOARD OF SCHOOL ESTIMATE OF JERSEY CITY; AND RICHARD F. McCARTHY; ALL INDIVIDUALLY AND AS REPRESENTATIVES OF A CLASS OF CLASSES, PLAINTIFFS,
v.
WILLIAM T. CAHILL, GOVERNOR OF THE STATE OF NEW JERSEY; JOSEPH M. McCRANE, JR., TREASURER OF THE STATE OF NEW JERSEY; GEORGE F. KUGLER, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; RAYMOND H. BATEMAN, PRESIDENT OF THE NEW JERSEY SENATE AND THE NEW JERSEY SENATE; WILLIAM K. DICKEY, SPEAKER OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY AND THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY; THE STATE OF NEW JERSEY; CARL L. MARBURGER, COMMISSIONER OF EDUCATION AND THE DEPARTMENT OF EDUCATION; THE STATE BOARD OF EDUCATION; ALL IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 19, 1972.
*226 Mr. Harold J. Ruvoldt, Jr., for plaintiffs (Messrs. Ruvoldt and Ruvoldt, attorneys).
Mr. Stephen G. Weiss (Mr. Weiss was an Assistant Attorney General when this action was commenced and has continued with the case as special counsel.) for defendants (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
Mr. William J. Bender and Mr. Frank Askin filed a brief amicus curiae on behalf of the Education Committee of the *227 National Association for the Advancement of Colored People, Newark Chapter, and the American Civil Liberties Union of New Jersey (Mr. David G. Lubell and Mr. Paul Tractenberg of the New York Bar, of counsel).
Mr. Melville D. Miller, Jr., Staff Attorney, State Office of Legal Services, Department of Community Affairs, filed a brief amicus curiae on behalf of the poor of New Jersey (Mr. Carl Bianchi, attorney).
Mr. Robert A. Coogan filed a brief amicus curiae on behalf of Gerald K. Loeb (Messrs. Saling, Moore, O'Mara and Coogan, attorneys).
BOTTER, J.S.C.
This action challenges the constitutionality of the system of financing elementary and secondary public schools of New Jersey. The case is similar to cases in other states, such as California, Minnesota and Texas, where conflict with the Fourteenth Amendment equal protection clause was asserted recently.[1] Also present are questions of state constitutional law, namely, whether the equal protection and education clauses of the State Constitution are violated by New Jersey's statutory financing scheme.
Plaintiffs in this action include residents, taxpayers and officials of Jersey City, Paterson, Plainfield, East Orange and the Township of Berlin (Camden County).[2] They assert claims on behalf of all persons in New Jersey who have similar interests. Defendants include branches of the state *228 Government and state officials who have or may have functions to perform in the enactment or administration of laws dealing with education and state financing.
The system of financing public education in New Jersey relies heavily on local property taxes. It produces wide disparities in educational expenditures. Plaintiffs contend that public school education is a state function which must be afforded to all pupils on equal terms. They contend that a "thorough" education is afforded to some pupils but denied to others, and that the system discriminates also against property owners who are taxed at different rates throughout the state for the same public purpose.[3]
The Attorney General, defending the constitutionality of our state statutes, concedes that differences in expenditures exist, and that inadequacies are present in some schools. He contends, however, that the statutory system is constitutional; that the "State School Incentive Equalization Aid Law," commonly known as the Bateman Act,[4] will increase state aid for certain deprived districts and will greatly reduce discrepancies caused by district wealth variations, that unequal expenditures do not necessarily prove unequal education, and that local control and responsibility to meet *229 various interests justify the present system of shared funding. The court is urged to defer to the Legislature's judgment in an area as complex as education.
Public schools are financed primarily by local real property taxes augmented by various forms of "state aid," such as "formula aid," transportation aid, school building aid, lunch aid, etc., and federal aid. When this action was commenced in 1970, the State School Aid Law of 1954, as amended, was in effect. L. 1954, c. 85, as amended; N.J.S.A. 18A:58-1 et seq. This law included a "foundation program" consisting principally of minimum aid plus equalization aid, referred to as "formula aid" because it is based on a formula.
Under the foundation program formula each district received equalization aid of $400 per pupil less its "local fair share," and in any case not less than $75 (minimum aid) per pupil. N.J.S.A. 18A:58-5. Cities with population over 100,000 (Newark, Jersey City, Paterson, Camden, Trenton and Elizabeth) received an additional $27 per pupil L. 1966, c. 31; N.J.S.A. 18A:58-6.1; and by virtue of L. 1968, c. 301; N.J.S.A. 18A:58-6.2 all districts received another $25 per pupil. Local fair share was defined as the equivalent of the amount of revenue that could be raised locally with a tax rate of $1.05 per $100 of equalized valuations (10 1/2 mills per dollar). N.J.S.A. 18A:58-4.
Equalized valuations is the term applied to the true market value of taxable real property in a district as determined by the State Director of the Division of Taxation through studies of recent sales. N.J.S.A. 54:1-35.1 et seq. Under this law, aggregate assessments in each taxing district are adjusted to produce an equalized or true market value for the district. See In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 26-27 (1961). Equalized valuations are used to establish uniformity in the distribution of state aid despite unequal assessing practices. See Switz v. Middletown Tp., 23 N.J. 580, 586 (1950).
*230 Thus, under the foundation program, every district received $100 per pupil, plus the difference, if any, between $325 and the local fair share (plus $27, if the district was one of the six largest cities). By 1969-70, however, every school district in the State had annual budgets which exceeded the level "guaranteed" by the foundation program. The statewide average was over $800 per pupil. Today, two years later, the statewide average current expense per pupil is $1,009. All districts, therefore, had to finance the excess expenditure by local taxes, in addition to the local fair share. Some districts, of course, whose local fair share was high, received only the minimum aid of $100 per pupil.
Our principal concern is the Bateman Act, which was passed while this action was pending. The complaint was amended to bring that act under attack. However, the foundation plan is still relevant because the Legislature funded the Bateman Act for 1971-72 at a "20%" level, defined as that amount which would have been paid in 1971-72 under the foundation plan, plus 20% of the difference between that aid and Bateman Act aid if Bateman were fully funded. N.J.S.A. 18A:58-18.1. For next year, 1972-73, this ratio has been raised to 40% L. 1971, c. 335, adopted December 7, 1971.
The details of the Bateman Act will be discussed later. This introduction is simply to show that the increase in formula aid under the Bateman Act in the first year has been negligible in most districts. Some poor districts received significant increases, however, especially those who benefited by the weighting factor in the formula for AFDC children (aid to families with dependent children.[5] However, relatively few school districts had an increase of $50 or more per pupil in 1971-72. Among the larger increases were $67.48 for Asbury Park, $80.41 for Camden, $109.82 for Newark, $98.51 for Trenton and $54.58 for Jersey City. *231 The largest increase was $115.95 for Winfield Township, the poorest district in taxable property per pupil. Thus, under the present law school districts continue to raise the bulk of their funds by local taxes. On a statewide basis local taxes pay for about 67% of public school costs, federal aid is about 5%, and the balance (28%) comes from state funds.
In 1971-72 the principal items of state aid allocable to current expenses  formula aid under Bateman ($245,013,900), state transportation aid ($31,270,200), atypical pupil aid ($32,688,900), school lunch ($6,500,000) and vocational education aid ($3,479,000)  constitute approximately 21% of the aggregate of all current expenses. Current expenses for all districts are approximately $1.5 billion.[6]
Fully funded and implemented, the Bateman Act would significantly improve upon the foundation plan in equalizing local revenue-raising power. However, school costs have been increasing at a rate of approximately 10% per year. The average increase is close to $100 per pupil annually. See Basic Statistical Data of New Jersey School Districts, Bulletin A71-2 (July 1971), published by the New Jersey Education Association, hereinafter referred to as NJEA Bulletin, at page 14. Thus, increases in Bateman formula aid at "20%" increments per year will not offset the annual rise in school costs except, possibly, in a few districts. Accordingly, the statistics in Schedule A, annexed hereto, based in part on pre-Bateman data and in part on post-Bateman data, furnish a reasonable basis for evaluating the present system.

I. THE SCHOOL SYSTEM
There is also an artificial aristocracy, founded on wealth and birth * * *. The artificial aristocracy is a mischievous ingredient in government, and provision should be made to prevent its ascendency.
* * * At the first session of our legislature [in Virginia] after the *232 Declaration of Independence, we passed * * * laws, drawn by myself, [which] laid the ax to the foot of pseudo-aristocracy. And had another which I prepared been adopted by the legislature, our work would have been complete. It was a bill for the more general diffusion of learning. This proposed to divide every county into wards * * * like your townships; to establish in each ward a free school for reading, writing and common arithmetic; to provide for the annual selection of the best subjects from these schools, who might receive at the public expense, a higher degree of education at a district school * * *. Worth and genius would thus have been sought out from every condition of life and completely prepared by education for defeating the competition of wealth and birth for public trusts.
  Thomas Jefferson,
 in a letter to John Adams,
 1813.[7]
There are approximately 600 separate school districts in the State. Approximately 300 operate elementary schools only; approximately 200 districts operate a complete system of elementary and secondary schools, and 45 districts operate secondary schools only (such as grades 7-12 or 9-12). The balance includes 21 nonoperating districts (sending pupils to other districts and paying tuition), 20 county vocational districts, and 3 districts that operate special classes only for handicapped children.
There are 51 type I districts (N.J.S.A. 18A:9-2); the remainder, including regional (N.J.S.A. 18A:13-1 to 50) and consolidated (N.J.S.A. 18A:8-25 to 41) school districts, are Type II districts (N.J.S.A. 18A:9-3). In a type I district, members of the board of education are appointed by the chief executive officer of the municipality. N.J.S.A. 18A:12-7. In a type II district they are elected by the public at an annual school election. N.J.S.A. 18A:12-11. In all districts the board of education proposes the annual school budget. It is then submitted for approval to the voters at the school election in a type II district (N.J.S.A. 18A:22-33), or to the board of school estimate *233 in a type I district (N.J.S.A. 18A:22-7).[8] If rejected by the voters in a type II district, the governing body must fix the budget. In a type I district, the board of school estimate may reject the proposed budget by certifying a lesser amount of money to the governing body. The municipal governing body must appropriate the amount certified, unless it exceeds 1 1/2% of assessed valuations, in which case a lesser sum may be fixed. N.J.S.A. 18A:22-15, 17.[9] See Board of Education, Elizabeth v. City Council, Elizabeth, 55 N.J. 501 (1970); Board of Education, East Brunswick Tp. v. East Brunswick Tp., 48 N.J. 94 (1966).
If the budget adopted by the governing body in a type I or type II district is less than that proposed by the board of education, that board may appeal to the State Commissioner of Education. The Commissioner may then restore part or all of the budget cuts "within the limits originally proposed by the board of education" if he finds those funds are necessary to assure a "thorough and efficient" school system. See East Brunswick Tp., supra, 48 N.J. at 107. In no case has the Commissioner fixed a budget which exceeded the local board's proposed budget, although he may have the power to do so.[10]
*234 The State Board of Education has overall control and supervision of public school education in the State (N.J.S.A. 18A:4-10), and is authorized to adopt rules and regulations for carrying out the state school laws, N.J.S.A. 18A:4-15. The Commissioner is the chief executive officer of the State Department of Education. He is the agent of the State Board for all purposes. N.J.S.A. 18A:4-22. N.J.S.A. 18A:33-1 requires each school district to provide educational facilities and courses of study suited to the "ages and attainments" of all pupils. Our State Constitution (1947) requires a "thorough and efficient" system of education. Art. VIII, § IV, par. 1. With these provisions in mind, the Supreme Court in the Elizabeth case, surpa, said:
Thus it is the duty of the Commissioner to see to it that every district provides a thorough and efficient school system. This necessarily includes adequate physical facilities and educational materials, proper curriculum and staff and sufficient funds. [55 N.J. at 506]
The State Board has adopted regulations which offer consulting services for the purpose of improving elementary school programs. However, no minimum curriculum or standards of achievement for elementary schools have been fixed by regulations, although authorized by statute. N.J.S.A. 18A:4-25. State control of instructional standards is exercised largely through certification of teachers and investigation of facilities and programs by the office of the county superintendent of schools. The county superintendent is appointed by the Commissioner with approval of the State Board. N.J.S.A. 18A:7-1.
More control is exercised over secondary education. Local boards of education must develop a high school program and submit it to the State Board for approval. N.J.A.C. 6:27-4a. The program must be found sufficient to meet the needs of students to "stimulate each pupil to achieve the highest level of attainment of which he is capable." N.J.A.C. 6:27-4d. State regulations also require adequate staff, *235 equipment and facilities and teaching loads that permit "a reasonable amount of attention * * * to the individual needs of the pupils." N.J.A.C. 6:27-8b.
The Commissioner has the power to direct the abandonment of part or all of a school building and to order alterations. N.J.S.A. 18A:20-36. The Commissioner, through county superintendents, has the power to withhold state aid from any district which does not provide suitable facilities and courses of study. N.J.S.A. 18A:33-2. However, the Commissioner has used these powers sparingly. Withholding state aid compounds problems whose major source is inadequate funds in the first place. Closing outmoded school buildings without the funds to build a replacement presents practical difficulties. What will you do with the children? On rare occasions the Commissioner has condemned a high school program as totally inadequate. In one case this resulted in the formation of a regional district of adequate size and efficiency.
But the net of practical considerations is that the quality of education has been left largely in local hands. Local school boards and municipal officials obviously consider not only educational needs but also the sentiment of the taxpaying public. School budget rejections by voters are commonplace. In 1969 a record number of budgets were rejected, namely, 170 of 524, or 32.4%. N.J. Model Cities Report, supra, at 205. Also, bonds for construction of school facilities have been voted down in 41% of all elections in 1969-70. Harold P. Seamon, Jr., "Bond Sales for Public School Purposes in New Jersey," School Board Notes (Sept/Oct. 1971) at 20. As a practical matter, therefore, budgets fixed by local boards have restrained the Commissioner's enforcement of our constitutional and statutory requirements for a thorough education. Local property taxing power is the primary force under public school education in our present system.

II. FISCAL COMPARISONS
The people of this State constitute a commonwealth, and in the prosperity of this commonwealth all the citizens have an equal interest. * * *
*236 New Jersey recognizes the wisdom of this in assessing a uniform rate of tax upon each citizen for the support of her schools, in proportion to the amount of property he possesses, and in apportioning the amount thus raised to the several school districts on the basis of their school census. * * *
Every true man * * * should be proud of his State * * *. He should rejoice to see all her children receive an education, whether they live in counties made wealthy by cities and by concentrated manufacturing industries, or in those still poor, with their primitive forests. If he has wealth, he should willingly give his share for the education of the children of the poor * * *.
  Ellis A. Apgar, State Superintendent
 of Public Instruction,
 N.J. School Report, 1878.
The financial effects of our present system are shown in Appendix A. Appendix A includes approximately 25% of all operating districts in the State. Statewide averages and total enrollment are shown on the first line of page 1. Districts are arranged in each county in the order of highest to lowest in per pupil equalized valuations. The most recent data (1971-72) has been used where available. Some data which is two years old (1969-70) had to be used because more current data was not available. For example, teachers' salaries per pupil are 1969-70 figures. Since expense per pupil figures are for 1971-72, teachers' salary costs must be increased by approximately 20% because of inflation in order to correlate teachers' salary costs with current expenses. See NJEA Bulletin, at 14.
Districts listed in Schedule A include in most cases the highest and lowest in equalized valuations per pupil in each county, and a random sampling of districts in between, and one or two regional districts (column 1). Current expense per pupil, estimated, 1971-72 (column 2) includes the cost of instruction, administration, transportation, maintenance, fixed charges (such as insurance costs and pension contributions) and certain sundry accounts. Debt service is not included. (Total statewide debt service in 1971 is estimated at $130 million, or $87 per pupil.) Professional staff per 1,000 weighted pupils, 1969-70 (column 5), does not use *237 the weighting formula of the Bateman Act; it uses the weighting formula in the NJEA Bulletin, at 18, which is slightly lower and does not include a weighting factor for AFDC children. Professional staff includes special services, guidance and supervisory personnel, and administrators, equated to full-time positions. Equalized school tax rate (column 8) is the school tax levied (including any debt service payable by the municipality in type I districts) using equalized valuations. The sources of this data are noted below.[11]
The most obvious aspect of Appendix A is district to district diversity. However, diversity alone may not prove differences in the quality of education. Many factors may account for differences in expenditure. Districts spend more for high school than elementary school programs; variations in the cost of living across the State may affect the cost of education; districts vary in size (Greater Egg Harbor Regional High School district is over 339 square miles while Victory Gardens in Morris County is 0.14 square miles). Transportation costs and certain fixed costs and capital expenditures may represent a higher per pupil expense in one district than another. Other factors may affect efficiency and costs, so that higher costs will not always connote better education. Moreover, differences in class size (as reflected in column 3 of Appendix A) may not appreciably affect the quality of education. Nor is teacher performance necessarily a direct reflection of his or her salary level.
Nevertheless, Appendix A shows a distinct pattern in every county in the State. In most cases, rich districts spend more money per pupil than poor districts; rich districts spend more money on teachers' salaries per pupil; rich districts have *238 more teachers and more professional staff per pupil, and rich districts manage this with tax rates that are lower than poor districts, despite "equalizing" aid. The same conclusion was reached by Engelhardt, Engelhardt and Leggett, education consultants to The Committee to Study the Next Steps of Regionalization and Consolidation in the School Districts of New Jersey, A Pilot Study of School District Reorganization (1968), at 26-27, hereinafter called, Pilot Study. (The foregoing committee was appointed in 1967 pursuant to resolution of the State Board of Education. The committee's report of April 1969 is referred to as the Mancuso Report, after Ruth H. Mancuso, chairman.) The Pilot Study also reports (at 26) that there was a "direct relationship between equalized value per pupil and median teachers' salaries," with median salaries rising significantly when valuations per pupil exceeded $35,000 in 1965.
Figure I, on page 239, illustrates the relationship between
*239 *240 valuations and expenditures per pupil and the inverse relationship between expenditures and tax rates. Figure I shows that districts with high valuations spend more money per pupil on education, but have lower tax rates, nevertheless. The poorest district in the State in valuations per pupil, Winfield Township, is the last district depicted on the chart. Its bar is shaded differently to show a tax rate which exceeds in length that portion of the bar which represents expenditures per pupil.
Other characteristics tend to vary directly with valuations. Thus, with a $1.43 school tax rate compared to $3.69 in Newark, Millburn has more teachers per pupil than Newark, spends more for teachers' salaries (1969-70) per pupil ($685 to $454), and has more professional staff per weighted pupil (61 to 53). In Camden County, Haddonfield and Audubon Park compare as follows: 18.9 to 27.2 pupils per teacher, $478 to $293 in teachers' salaries (1969-70) per pupil, and 55 to 44 in professional staff per 1,000 weighted pupils. Thus, Haddonfield gets more with a $2.33 tax rate than Audubon Park with a $5.59 tax rate. In Monmouth County, Deal and Union Beach compare as follows: 14.8 to 26 pupils per teacher, $717 to $328 in teachers' salaries (1969-70) per pupil, and 74 to 42 in professional staff per 1,000 weighted pupils. Both are grades K-8 districts.
Winfield Township in Union County is only 0.17 square miles in area. It has the lowest equalized valuations per pupil in the State, namely, $3,921. Despite this, its current expense per pupil for 1971-72 is $1,253, which is well above the state average. This includes approximately $500 per pupil in state aid. In 1971 the equalized school tax rate was $15.11 and the total equalized municipal tax rate was $20.14. This represents an extraordinary tax effort. It means that a taxpayer in Winfield Township pays an amount equal to the value of his residence every seven years just to raise money for school purposes, or every five years to raise money for school and all other municipal services. (A tax *241 rate in excess of 4% is considered counterproductive since investors can own property elsewhere at lower rates. Higher tax rates may become confiscatory.)
Winfield Township was incorporated by L. 1941, c. 360, composed of land lying in part in the City of Linden and, in part, the Township of Clark. Certain other small districts which have been created by legislative action also appear to be disadvantaged, economically. Victory Gardens in Morris County (0.14 square miles), incorporated by L. 1951, c. 259, has $13,023 in equalized valuations per pupil; and Audubon Park in Camden County (0.15 square miles), incorporated by L. 1947, c. 418, has $4,596 in equalized valuations per pupil. Their respective current expenses are $999 and $771 per pupil; in 1971 they had equalized school tax rates of $4.52 and $5.59, respectively. There was no evidence offered at trial directed specifically to these small districts. However, counsel have stipulated that a brief description of the origin of Winfield Township as revealed in an unpublished study may be included in the record.[12]
*242 The statewide spectrum of valuations and expenditures can be shown best, perhaps, by looking at the total number of pupils in various ranges, regardless of location. The following tables speak for themselves (county vocational and special class districts have been omitted):

 TABLE I  VALUATIONS PER PUPIL
EQUALIZED NUMBER NUMBER
VALUATIONS OF OF
 PER PUPIL DISTRICTS PUPILS
Below $10,000 4 10,593
$10-20,000 38 160,631
$20-30,000 107 288,611
$30-35,000 59 154,053
$35-40,000 64 151,419
$40-45,000 55 214,498
$45-50,000 68 168,109
$50-60,000 57 148,486
$60-90,000 84 163,144
$90,000 plus 42 25,743
 TABLE II  CURRENT EXPENSE PER PUPIL
 NUMBER NUMBER
EXPENDITURES OF OF
 PER PUPIL DISTRICTS PUPILS
Below $700 14 13,391
$700-800 54 83,917
$800-900 75 274,881
$900-1,100 248 631,975
$1,100-1,200 65 235,522
$1,200-1,500 106 215,948
Over $1,500 16 29,653

Other comparisons can be made. Industrial and commercial property distributions were studied by Neil Gold, Director of the Suburban Action Institute. He testified that 112 municipalities with 11% of the State's population had commercial and industrial property almost equal in value to that possessed by a group of municipalities containing 39% of the State's population. The first group raised only $62 million in taxes compared with $262 million by the second group. The first group raised these taxes at a tax rate under 2% while the poorer groups taxed at rates of 6% or *243 more. Yet most of the poorer communities must serve people of greater need because they have large numbers of dependent minorities, that is, blacks and those whose origin is Puerto Rican or Cuban. This may be illustrated by comparing nine municipalities that can be classified as "wealthy suburban" with five municipalities which may be termed "central city."

 TABLE III  COMMERCIAL REALTY COMPARISONS
 Black &
 Spanish
 Commercial 1970 Speaking Equalized
 School Property Population Pupils School Tax
 District (millions) (thousands) (1969) Rate (1971)
Edison $272 67 3.1% 1.16
Paramus 259 28 0.0% 1.90
Union Tp. 177 53 11.3% 1.32
Bridgewater-Raritan 162 30 0.9% 2.05
Berkeley Heights 137 13 0.1% 2.04
North Brunswick 115 17 3.0% 1.59
Mahwah 104 11 2.0% 1.63
East Hanover 85 7 0.2% 1.73
Englewood Cliffs 65 6 0.2% 1.20
 ______ ___
 TOTAL $1,376 232
 ______ ___
Newark $665 380 81.7% 3.69
Jersey City 298 253 56.5% 2.82
Paterson 189 143 63.1% 2.57
Camden 130 101 70.8% 2.57
Trenton 109 102 73.2% 2.80
 ______ ___
 TOTAL $1,391 979
 ______ ___

Wealthy suburbs are able to attract industry from central cities by preferential tax rates. The erosion of the central city tax base makes it more difficult for these cities to raise revenues for school and municipal purposes. This condition has developed largely in the last 20 years. During that period, in 39 major metropolitan areas of the country 85% of all industrial and commercial growth, measured by jobs, has taken place in the suburbs. In New Jersey the rate has *244 been 95%. The result is a declining tax base in older cities, in relative terms. Although the statewide average of equalized valuations per pupil rose from $30,112 in 1960 to $41,026 in 1971, some central cities suffered a decline in valuations per pupil in absolute or relative terms, or both. These trends are shown in Table IV below:

 TABLE IV  VALUATION TRENDS
 EQUALIZED VALUATIONS
 ENROLLMENT PER PUPIL
CAMDEN
1960-61 17,829 $17,777.
1969-70 19,915 16,487.
JERSEY CITY
1960-61 31,645 26,570.
1969-70 37,428 26,675.
PATERSON
1960-61 21,956 21,000.
1969-70 25,874 23,021.
PLAINFIELD
1960-61 8,529 26,771.
1969-70 9,116 30,943.
EAST ORANGE
1960-61 8,797 37,533.
1969-70 10,148 32,152.
STATE
1960-61 1,055,085 30,112.
1969-70 1,448,686 38,172.

Rising tax rates in cities compel compromises in funding services for education and other purposes. Nor is this trend likely to be reversed in the near future. What is more important and harmful is the separation of classes of people which has occurred in recent years. Social isolation aggravates the impact of economic differences in education. See Booker v. Board of Education, Plainfield, 45 N.J. 161, 170, 171 (1956).
*245 There are, of course, many districts of low wealth other than central cities. But the plight of the older city, in which large numbers of black and other deprived minorities are isolated, presents an especially acute educational challenge. See Carl A. Marburger, "Considerations for Educational Planning," in A. Harry Passow, ed., Education in Depressed Areas (Bureau of Publications, Teachers College of Columbia University, New York 1963), at 298. (Dr. Marburger is now the Commissioner of Education of New Jersey.) Of course, the State and Federal Governments have recognized the problem. Added school aid from both sources has been made available to these cities in recent years.[13] For a comprehensive survey of older city problems, see N.J. Model Cities Report, supra.
The decision in this case, however, does not turn upon the special needs of older, large cities. The problems presented by the school funding system in New Jersey confront many poor suburban and rural districts as well.
Thirty-two school districts in New Jersey with an enrollment of less than 2,000 pupils each have equalized valuations per pupil under $20,000; 71 more school districts with less than 2,000 pupils each have between $20,000 and $30,000 in *246 equalized valuations per pupil. Thus, 103 small school districts have valuations per pupil of less than $30,000 at a time when the state average valuation per pupil is over $41,000. Of these 103 small districts, 72, or approximately 70%, spend less than $900 per pupil for current expenses at a time when the state average is $1,009. Bear in mind that the state averages are brought down by the poorer districts. This may have reflected itself in the testimony of Dr. Edward Kilpatrick, Assistant Commissioner in charge of the Division of Administration and Finance, State Department of Education, when he said that $1,200 per pupil would fund a fine educational program, looking at dollars alone.
Table II above shows that only 21% of all school districts, with 17% of the statewide enrollment, have current expense budgets of $1200 or more. On the other end of the scale are 143 districts, with 372,189 pupils, or 25% of statewide enrollment, with current expense budgets under $900. One district, Tabernacle Township in Burlington County, a K-8 district with 511 pupils, has a current expense budget of $561 per pupil. This is the lowest expenditure in the State. As will be shown later, the Bateman Act offers the least aid to poor rural and suburban districts which have a low AFDC population component.

III. QUALITY OF EDUCATION
 "Come, Tom," said Mother.
 "Are you ready for school?
 Are you ready, Betty?
 Run to school, Tom.
 Run fast, Betty."
  Ousley and Russell,
 On Cherry Street
 (a Ginn "basic reader".)
The quality of elementary and secondary education in New Jersey probably runs from good to excellent in the vast majority of school districts. In some it is not simply poor, it is inadequate. Unfortunately, this case deals with the problems we have, not our successes.
*247 The Commissioner of Education does not systematically test achievement levels of students although he is authorized by N.J.S.A. 18A:4-24 to do so in order to ascertain the "thoroughness and efficiency" of any public school. The Commissioner apparently hears about certain problem schools from county superintendents who know where the trouble spots are. High school programs are approved by the Department of Education, and these schools are examined by state teams every five years. However, there is no published general evaluation of the condition of education in New Jersey. One may wonder why this is so when we are dealing with the most important function of our government, spending over $1.7 billion per year on our most valuable asset, the children of this State. An evaluation system can be readily devised. Each school could be required to administer tests and submit reports of some uniform type so that comparisons could be made. In any case, the closest we came in the testimony was by one witness, Joseph Clayton, a former Assistant Commissioner and, for a time, Acting Commissioner. He testified that about 20% of our school districts have schools that furnish inadequate education, though not necessarily all schools in the district. No estimate was given of the number of pupils involved. These schools are in poor rural areas, in old cities, and in poor suburbs as well.
If nationwide comparisons are of any help, 1970-71 figures show that New Jersey ranks high, third in the nation, in current expenditure per pupil. Only New York and Alaska were higher. New Jersey ranked sixth in average salaries of secondary school teachers ($10,250) and eighth in average salaries of elementary school teachers ($9,875). Research Division, National Education Association, Rankings of the States, 1971 (Research Report 1971-R1), at 21, 22, 62. These rankings are consistent with the wealth of New Jersey residents: third in personal income per child of school age ($17,087) and seventh in per capita personal income ($4,241) in 1969. Ibid. at 30, 32.
*248 But averages conceal disparities. The question is not how well we are doing on the average; the question is whether New Jersey's system of financing public schools creates impermissible disparities between rich and poor districts in educational opportunity, as well as tax burden. The Attorney General disputes the conclusion that mere differences in dollar expenditures prove differences in the quality of education. He doubts the ability of the court to grapple with an issue as large and complex as the public school system; and there is some merit to both of these contentions. However, based on probabilities and expert opinion, in this as well as other kinds of cases, some conclusions can be drawn. As might be expected, there is a correlation between dollar expenditures and input (such as teachers and facilities), and between input and output (results).
The criteria proposed by the State Board and the Permanent Commission (see note 3) for classifying districts under the Bateman Act (to be discussed later) include input and output measurements. In budget appeals the Commissioner himself decides on a case by case basis what funds are necessary for a "thorough" education and what are not. In doing so he looks at the proposed use for the funds and the specific needs claimed. He also examines statistics in those categories which are included in Schedule A as some general gauge of the quality of education in the system. For example, in the 1969 budget appeal by the Board of Education of Englewood Cliffs, seeking to restore funds rejected by the voters and the governing body, the Commissioner noted that Englewood Cliffs was among the highest in expenditures per pupil, salary schedules, facilities and equipment, and had one of the lowest pupil-staff ratios in the State. New Jersey School Law Decisions (1969), at 105. It is one of the few districts with closed-circuit television. The Commissioner found that these were the products of high community aspirations and a very favorable tax base. The Commissioner decided that Englewood Cliffs was spending enough, and he refused to restore any of the budget cuts.
*249 How much is enough may be difficult for anyone to answer. However, it is less difficult to decide when input and output both are inadequate.
The principal ingredient in good education is good teachers. This, of course, is hard to measure statistically. One witness testified that high intellectual and verbal skills of a teacher are invariably associated with good teaching and good results. However, there are no available statistical comparisons of this quality in our teachers. Other measures have to be used for the purposes of this case. We have already noted that poorer districts have fewer teachers and less professional staff per pupil. A great enough difference may make the task of some teachers more difficult, allowing for less specialization and less preparation time for each subject. Some evidence was also submitted showing that wealthy districts have a higher percentage of teachers with advanced degrees. For example, the percentage of teachers with a master's degree in Millburn is 47%, in Princeton Regional 41%, and in Englewood 39%. In Jersey City it is 23%, Newark 18%, and Camden 13%. The Pilot Study, supra, at 27, found that only one school district with equalized valuations of less than $30,000 per pupil in 1965 had a staff of which 30% or more had a master's degree. The evidence also shows that there is more teacher turnover in the poorer districts, with teachers leaving for more attractive school systems in wealthy suburban areas. These aspects allow some correlation between the quality of teaching and the wealth of the district, even though one does not need a master's degree to be a good teacher.
Other input factors include school buildings, equipment, text books and library facilities. There is ample evidence to show the correlation between wealth and the quality of these facilities, and that severe inadequacies exist in many poor districts.
In Paterson 7 of 26 elementary schools in use were built between 1887 and 1899. Many buildings do not meet state standards for lighting and safety equipment. Only two or *250 three schools have a library or librarian. Cafeteria and recreation areas are inadequate. Similar conditions can be found in other districts. In East Orange, where 54% of the population is black but 90% of pupil enrollment is black, 8 to 12 buildings were built before 1914, including one in 1873 and one in 1893. Instructional space equivalent to 76 classrooms is located in basement and attic areas, and 19 relocatable classrooms are in use. These substandard classrooms serve approximately 2,000 pupils. In Plainfield the health room in one school has no sink or toilet.
In the City of Camden 8 of 34 schools in use (over 20%) were built between 1874 and 1897. Some are three-story wooden frame structures. In some, lighting, ventilation and toilet facilities are inadequate. A study of the Camden school system by the State Department of Education was compiled in November 1969. The report, here called the Camden Survey, concludes at page F-39 that almost all elementary schools in Camden are deficient in facilities for desirable programs such as art, music, science, home economics, etc. Also needed are suitable libraries and special services such as remedial reading, speech therapy and psychological assistance. Camden has 23 school buildings on sites of one acre or less. This precludes outdoor educational programs.
Again, deficiencies are not limited to schools in the older cities. Inadequacies due to lack of financing exist in other areas of the state. For example, Pine Hill is a K-6 school district in Camden County, with 874 pupils in three schools. Pine Hill may fall somewhere between a rural area and a suburb. Pine Hill has equalized valuations per pupil of $13,354 and a school tax rate of $3.52. Even with state aid of over $300 per pupil, the present current expense budget is only $691 per pupil. Dr. Mark Hurwitz, Executive Director of the New Jersey School Boards Association (see N.J.S.A. 18A:6-45), was superintendent of schools of Pine Hill from 1965 to 1967. He testified that Pine Hill's budget was *251 voted down every year since 1954. When two submissions were required the electorate voted the budget down twice in the same year, even after it was pared down.
Dr. Hurwitz had to serve in two capacities, school superintendent and the principal of one school. There was no trained librarian in the system. In one school there was a closet with books that served as a library. Some science text books dated back to the 1940's, before astronauts had been heard of. There was no guidance counsellor or speech therapist. A psychologist was available one day a month. Special program aids were virtually nonexistent. Pupils who were either gifted or below average could not get special instruction or materials, unless they qualified as handicapped, because Pine Hill could not afford options to meet special needs. Teacher recruitment was difficult. Five teachers operated on emergency certificates without a college degree. Two such teachers have taught in the system for more than 20 years. Not one teacher had an advanced degree.
Pupils from Pine Hill went into the Lower Camden County Regional district (grades 7-12) which took pupils from seven elementary school districts. Those from Pine Hill had difficulty competing with other pupils, even with those from districts that were not much wealthier. A large percentage of Pine Hill pupils scored below national norms in tests for reading achievement and basic skills. Dr. Hurwitz concluded that the education in Pine Hill was inadequate due to insufficient funds.
Other evidence was offered to show inadequate education, both in terms of input and output. In Jersey City tests showed that average results at the end of the first grade were at the national norm but fell substantially below the national norm at the end of the seventh grade. A similar decline was shown by tests in Plainfield. This was interpreted as a failure of the system, since pupils able to learn at national norm levels do worse after being in the system for a number of years. There was evidence that a substantial number of pupils graduating from inadequate school systems *252 are functional illiterates who cannot properly read and understand writing in normal use, such as employment applications. A substantial portion of the students in the Camden City system cannot "read well, think well and work well," and some are illiterate, according to the Camden Survey, pages II-5 and III-8, 9.
In Camden, in 1968-69, 287 of 945 teachers had substandard teaching certificates  86 in secondary schools and 201 in elementary schools. Camden Survey, at P-4. There were only two Puerto Rican teachers in a system with 2,000 Puerto Rican students. Of 1,879 nonEnglish speaking children only 240 received instruction in English. In Paterson there are eight bilingual teachers for 4,000 Spanish-speaking children, a ratio of 1 to 500.
Naturally, the focus here is upon glaring, exceptional deficiencies. But indications are that they may occur more often than we would like to believe. It is difficult to imagine that in the 1960's a history book used in one lower school did not mention World War II, because, when the book was published, that war had not yet taken place. But such was the testimony of a former teacher. (How much can new books cost?) Also, in one school, classroom books could not be taken home because, old and torn, there was only one set of books, and several classes had to share them on the same day. Accordingly, if this opinion does not discuss theories of education, the importance of early schooling, or tenure and lock-step salary ranges and their effects upon teacher performance, it is for obvious reasons.
Not all shortcomings are the fault of the school system. The learning of a pupil from a deprived environment is impeded by many factors. For example, many pupils come to school hungry, or have uncorrected sight or hearing defects that would interfere with learning. Some students have migrated from even more inadequate school systems. But there is ample evidence in the record that these limitations can be offset significantly by improved educational offering. Better physical examinations and follow-up is a simple example *253 of how a school can overcome a learning handicap. Testimony in support of the more general conclusion was given by a number of witnesses, including Professor James W. Guthrie of the University of California and Henry M. Levin, Associate Professor in Economics and in Education, Stanford University. See Guthrie, Kleindorfer, Levin & Stout, Schools and Inequality (M.I.T. Press, Cambridge, 1970), a study for The Urban Coalition, first published in 1969.
Professor Henry S. Dyer, of the Educational Testing Service of Princeton, New Jersey, testified that pupil achievement is positively related to per pupil expenditure for instructional purposes. He estimated that the relationship is, roughly, on the order of .4 in correlation coefficient. This means that by his estimate per pupil expenditure is associated with about 16% of the variation in average pupil achievement. This is a positive but not a strong correlation. Others, including Guthrie and Levin, apparently see a higher degree of correlation. Professors Levin and Guthrie do not say that more money alone will make a difference. More money properly spent on proper programs can make a difference. Higher teacher salaries should enable a district to select teachers and supporting staff who are better fit for the needs of its pupils. More money can give districts options to attack their problems in ways not available to them now.
I am aware of the qualified doubts about the dollar-input-output relation raised by the so-called Coleman Report. J.S. Coleman, et al., Equality of Educational Opportunity (U.S. Printing Office, 1966). The report concludes (at 325) that family background and the social composition of the student body are the primary determinants of achievement in school.[14] The conclusions of the Coleman Report *254 have been disputed, and the methods of analysis and measurement that underly the findings have been criticized. See Guthrie et al., Schools and Inequality, supra, at 92, 96-99. In fact, more recently Dr. Coleman has applauded the concept of equalizing educational offering by equalizing financing power and tax effort through methods proposed by Professor Coons and his associates. Coons, Clune and Sugarman, Private Wealth and Public Education, infra, Foreword, at vii to xvi. The Coleman Report itself states (at 22) that "improving the school of a minority pupil may increase his achievement more than would improving the school of a white child increase his. Similarly, the average minority pupil's achievement may suffer more in a school of low quality than might the average of white pupils." So far as this court is concerned, the only evidence offered in the case does show correlation between educational expenditures and pupil achievement over and above the influence of family and other environmental factors.[15]
Chapter 4 of Schools and Inequality, supra, reviews 17 studies which attempt to determine the effects of schooling exclusive of a pupil's social environment. The authors note the difficulty of isolating environmental and congenital characteristics which affect a student's performance. These influences have a strong impact on the student even before he enters school for the first time. Nevertheless, a number of studies conclude that school services are significantly related to pupil achievement. One of the early studies performed by the Educational Testing Service of Princeton[16] *255 shows a direct correlation between pupil performance and school services such as (1) the number of special staff (psychologists, reading specialists, counsellors) in the school, (2) class size, (3) pupil-teacher ratio and (4) instructional expenditures per pupil. Other studies show a positive correlation between pupil performance and teacher characteristics (such as verbal ability, experience, salary level, academic preparation, etc.) and access to teachers (size of class, length of school year, etc.). The school environment, such as the age, size and type of facilities available, also affects learning, but to a lesser degree. Because the foregoing components can be translated into dollar costs, Professor Guthrie and his associates concluded that expenditures per pupil and teacher salary levels are significantly correlated with pupil achievement. Better education does make a difference regardless of the child's social environment.
Dr. Dyer submitted charts (P-23 in evidence) which show a correlation between per pupil expenditures and various gauges of performance, such as SAT scores and truancy rates. Figure VI of this exhibit shows the results of a controlled experiment in Hartford, Connecticut ("Project Concern") in which 266 elementary school children selected at random were transferred from five depressed inner city schools to 35 elementary schools in affluent suburbs. A group of 305 similar students remained in the inner city schools to serve as a control group. Results were then tested by gain or loss in I.Q. scores. The experimental group transferred to the suburbs presented a median gain for pupils in six grades (1 through 6) from the spring of 1967 to the spring of 1968 of 5.2 as compared with a median gain of 3.2 for the inner city group. Five of six grade groups transported to the suburbs made significantly greater gains in I.Q. than their counterparts in the city. (One group, grade 5, declined for unexplained reasons.) Grade 1 pupils in the suburbs gained 8.2 as compared with 3.0 for the city group.
Other testimony supported similar conclusions. Some studies show that students in depressed areas whose schools *256 have received substantial improvement under federal aid programs have achieved better than similar pupils in the same city attending schools which have not been changed. This result has been reported for Washington, D.C., as well as Jersey City.
That dollars can make a significant difference in pupil performance is the premise of the Camden Survey, supra, made by our State Department of Education. The Mancuso Report, supra, also concludes (at 9) that while "many communities are unable to adequately educate their youngsters, it is equally clear that many others are eminently successful. * * * Although there are some excellent small districts in the state, almost all evidence points to a correlation between enrollment, wealth, quality education and efficiency."
Limitations in this type of case, dealing with the system as a whole rather than problems of a given district, make it impossible to treat many aspects in the dollar-quality equation. To what extent can the consolidation of districts expand the range and quality of instructional opportunity without greatly changing costs? See Mancuso Report, supra. To what extent are high drop-out rates in central cities a reflection of unstimulating instruction, or other forces? Why do students from our deprived schools who want to go to college score appreciably lower in their SAT's than students from wealthy suburban schools? Should teachers get "combat pay" in some schools? Vocational training has not been explored in the case, but statistics in the NJEA Bulletin, p. 31, suggest that county vocational schools have not reached enough pupils who could profit by this type of training. There was testimony on other points that I cannot dwell upon. One example is the self-fulfilling negative attitude of middle-class teachers toward students of low socio-economic status. Also discussed was the low self-esteem of children from poor neighborhoods who begin their first contacts with American government by entering ancient, dilapidated buildings. Perhaps they ask themselves, "Is this what my state thinks of me?" (In school they are given a primer *257 which shows a white house surrounded by neat, green lawns. It reads, "Are you ready for school, Tom? Run to school, Tom. Run fast.") In any case even new schools won't take these children out of depressing neighborhoods. As was said recently about a black ghetto, the people who lived there "hated it so much that they had burned down a lot of it * * *. It was all they had, and they'd wrecked it." Kurt Vonnegut, Jr., Slaughterhouse-Five or The Children's Crusade, at 51 (Delta Books, New York, 1969).
Questions are asked because we do not have all the answers. Some conclusions, however, can be drawn on the specific issues of this case. Assistant Commissioner Edward Kilpatrick testified that his office had participated in the Camden Survey, supra, and wrote the following:
With this dependence upon local property taxes for the support of such services in New Jersey, it is inevitable that the children in the poorest communities do not have the same educational opportunities as those in the more affluent districts. [At H-2.]
The same report concluded (at III-3) that state aid under the foundation program is not sufficient to permit substantial improvement.
Clearly, a large number of New Jersey children are not getting an adequate education. This is caused in part by insufficient funds in many districts despite high taxes. On the other hand, many districts provide superior education with less tax effort. More money should make a significant difference in many poor districts. However, the problems in older cities with a large minority population are more complicated. It is too much to expect that our school system alone can solve all these problems. But much can be done, and doing more will cost more. Education is no exception to this fact of life.

IV. THE EDUCATION CLAUSE AND THE BATEMAN ACT
 Between the idea
 And the reality
*258
 Between the motion
 And the act
 Falls the Shadow
  T.S. Eliot,
 "The Hollow Men."

A. THE BATEMAN ACT
The essential features of formula aid under the Bateman Act consist of "minimum support aid" and "incentive equalization aid." N.J.S.A. 18A:58-5. Both are determined on a weighted pupil basis, and both are designed to vary according to the classification of a district. The act provides for classification in five categories, from basic to comprehensive, depending on the quality and scope of the educational program offered, with higher levels of aid offered as an incentive to program improvement through higher expenditures. See Bateman Report at 48, 49. Since the Bateman Act has not been fully funded, however, all districts are being treated as basic districts. The Legislature has continued this uniform classification for 1972-73 (L. 1971, c. 335, supra), and none can qualify for higher state aid based on higher classifications. Moreover, the classification criteria have not yet been adopted. Criteria formulated by the Commissioner with the approval of the State Board have been rejected by the Permanent Commission on State Support. Other criteria have been proposed. When agreement is reached the criteria are to be submitted to the Legislature for enactment. N.J.S.A. 18A:58-3.
"Minimum support aid" and "school district guaranteed valuation" are both based upon the number of resident weighted pupils of the school district. N.J.S.A. 18A:58-2. Pupils are weighted to reflect varying costs of education according to grade levels. N.J.S.A. 18A:58-2; Bateman Report, at 4. The principal categories of weights adopted by the Legislature are:

 Kindergarten pupils, .75 units
 Elementary pupils (grade 1
 through grade 6), 1.0 units

*259
 Senior and 4-year high school
 pupils (equated to full
 time), 1.3 units

Additional weight is given for AFDC children (children in families residing in the school district who receive assistance under a program of aid to families with dependent children) between the ages of 5 to 17, inclusive, who reside in the district. Whether attending school or not, each such child counts as an additional .75 units in determining the number of weighted children for the school district. N.J.S.A. 18A:58-2; Bateman Report at 48. Weighting increases aid to districts whose weighted enrollment is greater than actual enrollment. A 10% increase in pupils due to weighting will increase minimum aid and guaranteed valuations by 10%.
"State aid" under the Bateman Act is defined as minimum support aid, incentive equalization aid, transportation reimbursement, atypical (handicapped) pupil reimbursement, county aid and vocational school aid. N.J.S.A. 18A:58-2.[17] All districts receive minimum support aid. This is $110 per weighted pupil in a basic district. If the law is implemented by new legislation to establish classification criteria, minimum support aid will be increased in steps of $12.50 *260 each for a limited district, an intermediate district, a precomprehensive district, and a comprehensive district, reaching the maximum of $160 per weighted pupil.
"Incentive equalization aid" is given to a district whose actual equalized valuation per pupil is less than the guaranteed valuation per weighted pupil based on the district's classification. In a basic district total "guaranteed valuation" is a sum equal to $30,000 multiplied by the number of resident weighted pupils of the school district. The guaranteed valuations are to be increased in increments of $3,750 for each classification, reaching a maximum of $45,000 per weighted pupil in a comprehensive district.
The formula for determining incentive equalization aid is set out in N.J.S.A. 18A:58-5. First, you compare the "guaranteed valuations" with the equalized valuations of the district. If the equalized valuations are more than the "guaranteed valuations," no incentive equalization aid is paid. If equalized valuations are less than the "guaranteed valuations," incentive equalization aid is paid in addition to minimum support aid, calculated as follows: The "net operating budget" is first determined. This is defined as the current expense budget minus all estimated revenue, such as minimum support aid, transportation aid, federal aid, if any, etc. The "net operating budget" is then divided by total guaranteed valuations. The result is the district's school tax rate. That tax rate is then multiplied by the equalized valuations of the district to obtain the local tax requirement. The same tax rate is multiplied by the excess of guaranteed valuations over equalized valuations of the district to obtain the incentive equalization aid payable by the State.
Table V which follows depicts various tax rates that would obtain in a school district depending upon the current budget and the equalized valuations of the district. For purposes of illustration I have assumed districts with equalized valuations of $20,000, $30,000, $45,000 and $60,000 per pupil, and I have assumed that a district chooses to spend $1,000, $1,200 or $1,400 per pupil. The weighting factor *261 of 1.10 was assumed as a general average for all non-AFDC districts. See statewide pupil distribution data in the Commissoner's Nineteenth Annual Report (1969-70), at IX. Also, to determine the net operating budget, a deduction of $50 per pupil was assumed arbitrarily to represent other district revenue, such as transportation aid and federal aid, other than formula aid. Tax rates were computed for each district as a basic district as well as a comprehensive (Comp.) district.

 TABLE V  TAX RATES UNDER THE BATEMAN ACT
DISTRICT
EQUALIZED
VALUATION ANNUAL PER PUPIL EXPENDITURE
Per Pupil $1,000 $1,200 $1,400
 Tax Rate Tax Rate Tax Rate
 Basic Comp. Basic Comp. Basic Comp.
$20,000 2.51 1.56 3.12 1.97 3.72 2.37
$30,000 2.51 1.56 3.12 1.97 3.72 2.37
$45,000 1.84 1.56 2.29 1.97 2.73 2.37
$60,000 1.38 1.29 1.71 1.62 2.05 1.96
 ADJUSTED FOR 1.434 WEIGHTING, INCLUDING AFDC[18]
$20,000 1.84 1.12 2.31 1.43 2.77 1.74
$30,000 1.84 1.12 2.31 1.43 2.77 1.74

Using a basic district as an example, with equalized valuations of $20,000 per pupil, calculations under the formula can be simplified as follows:
Select the current total expense per pupil ($1,200); subtract $121 (minimum aid per pupil of $110, raised 10% due to a 1.10 weighting factor) and also subtract $50 (representing other revenue, such as transportation aid). This leaves $1,029 to be raised by local taxes and state equalization *262 aid. Divide $1,029 by $33,000 (the guaranteed valuation of $30,000 raised by 10% due to a 1.10 weighting factor) to get a tax rate of 3.12%. Thus, the amount to be raised by local taxes is 3.12% of $20,000, or $624. State equalization aid is $1,200 minus $121 (minimum support aid), minus $50 (other revenue), minus $624 (local revenue), or $405 per pupil. This is equal to 3.12% of the difference between equalized valuations per pupil ($20,000) and guaranteed valuations per weighted pupil ($33,000). Thus, this assumed basic district, spending $1200 per pupil, will raise $624 locally at a tax rate of $3.12 per $100, and will receive $121 in minimum support aid, plus $405 in state equalization aid, plus $50 in other revenue. Under the foundation plan this district would have received $215, i.e., $100 minimum aid plus $115 in equalizing aid (plus $27 if one of the six largest cities) per pupil. First-year Bateman aid would be $215 plus 20% of $311, or $215 plus $62.20. $311 represents the difference between Bateman aid fully funded ($526) and the foundation plan formula aid of $215, based on my assumed model.
Under the Bateman formula fully funded, excluding an AFDC weighting factor but assuming an average weighting factor of 1.10, basic districts are in effect guaranteed equalized valuations per pupil of $33,000. Districts with $33,000 or less in equalized valuations per pupil will have the same tax rate. Every basic district with more than $33,000 in equalized valuations per pupil, and with the same budget, will have a lower tax rate. Thus, the Bateman Act continues to employ a wealth-based formula. It differs from the foundation plan in that Bateman includes a weighting factor and allows relatively poor districts to receive, in addition to minimum support aid, a higher share from the State in proportion to the total expenditures of the district. Under the foundation plan the State participated only to the extent of a given level of expenditures, namely, $425 per pupil (plus $27 for the six largest cities).
*263 Districts with a high proportion of AFDC children will receive more minimum aid and a higher effective guaranteed valuation per pupil. Table V above shows the results of a weighting factor of 1.434 units in an assumed high AFDC district. The figures were computed, as indicated in note 18 above, by using the average of current Camden and Jersey City enrollments and AFDC populations. The effect of this weighting factor is to increase minimum aid by 43.4% to $157.74 and to increase the guaranteed valuations per pupil by 43.4%, from $30,000 in a basic district to $43,020. Thus, a basic district with a high AFDC population spending $1,200 per pupil will have a tax rate of 2.31%, approximately equal to the tax rate of a basic non-AFDC district with equalized valuations per pupil of $45,000.
The AFDC weighting factor would have an appreciable effect under Bateman fully funded. N.J. Model Cities Report, supra, states (at 19) that the total number of AFDC children in the State increased from 25,000 in 1965 to 72,000 in 1969-70. The Department of Education reports that the total number of AFDC children in the state is now 198,000. However, receiving increased formula aid or federal aid because of AFDC children should not be viewed as a windfall. It should cost much more to provide an adequate education in districts, such as Jersey City and Camden, where AFDC children between the ages of 5 and 17 are equal in number to roughly 30% to 60% of the total school enrollment. See note 18 above. This increased cost was appreciated by the Bateman Committee. The Bateman Report states
It is now recognized that children from lower socio-economic level homes require more educational attention if they are to progress normally through school. When the additional compensatory education is provided, it results in substantially higher costs. The weighting of the children from the lower income families compensates in part for the larger expenditure necessary to provide them with an adequate educational program so they may overcome their lack of educational background. [At 48; emphasis added.]
*264 Another desirable feature of the Bateman Act was the provision to allow an adjustment in minimum support aid and incentive equalization aid according to changes in the cost of education from year to year and changes in the statewide average of equalized valuations. N.J.S.A. 18A:58-6.3. Unfortunately, funding increments of "20%" per year will delay full implementation of the act and may not include money to allow adjustments for inflation. If Bateman had been fully funded in the first year with all districts classified as basic, the total formula aid required would have been approximately $365 million, an increase of approximately $150 million over 1970-71. The Legislature actually increased formula aid by approximately $28 million in the first year. But part of this increase was needed simply for additional pupils coming into the system, and part was also used for the save-harmless clause contained in N.J.S.A. 18A:58-18.1.[19] If all districts were classified as comprehensive districts, the estimated annual cost under the Bateman Act would be $650 million, based on September 30, 1970 weighted enrollments. This is an increase over the foundation program of approximately $430 million.
There is no refunding under the Bateman Act which would make it easier for a poor district to qualify as a comprehensive district. Many wealthy districts in the state would readily qualify as comprehensive districts under criteria suggested by the Bateman Committee (Bateman Report, at 61-63) or that presently being considered. However, the Bateman Committee recognized that some districts "might not be able to attain a higher classification for reasons beyond their control." Bateman Report, at 41. The Bateman Committee proposed that the Commissioner should *265 have the authority to change the classification of the district if, "in his judgment, the geography, sparsity of population, inadequacy of property valuations, difficulty of transportation or other factors make it impossible to qualify for a higher level of State aid." Id. This recommendation, however, was not adopted by the Legislature. The statute simply provides that criteria to be adopted for classifying districts shall take into consideration "the quality of the educational program of the districts." N.J.S.A. 18A:58-3. Thus, there is little likelihood of poor districts receiving state equalization aid as comprehensive districts. The present funding does not remotely approach the monies needed, and poor districts cannot do it on their own. Camden Survey, supra, at II-1.

B. THE EDUCATION CLAUSE
Article VIII, § IV, par. 1 of the 1947 New Jersey Constitution states:
The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.
This clause was first adopted in 1875 as an amendment to the 1844 Constitution. The history of education in New Jersey tells us that this provision was adopted in order to secure as a constitutional right the results of the first 100-year struggle in New Jersey for free and thorough education for all. See Roscoe L. West, Elementary Education in New Jersey: A History, at 42-45 (D. Van Nostrand Co., Inc., Princeton, 1964); Robert D. Bole, "A History of State School Support in New Jersey," The Bateman Report, supra, at 11.
In his abbreviated history contained in the Bateman Report, (at 12) Professor Bole says that the 1851 statute, which gave school districts unlimited taxing power, "set in *266 motion a trend which New Jersey retains to the present day; i.e., school financial support in New Jersey became predominantly a local responsibility." However, this history fails to mention the proportion of state aid in the critical period from 1871 to 1881, during which time the Education Clause was adopted.
In 1871 the Legislature enacted the Free School Law, L. 1871, c. 527. By this law tuition fees which had been charged by some "public" schools in the State were abolished. The 1871 law levied a uniform tax on all real property in the State at two mills per dollar valuation ($0.20 per $100). If this money was not enough to maintain free schools in operation for at least nine months each year, then local districts were required to raise the needed sum by a township tax. State school tax monies were distributed among school districts according to the number of pupils in each district. The law further provided that, except for $20 per year, state money paid to each school district must be used solely for teachers' salaries and fuel (section 10).
In discussing the 1871 law, State Superintendent Apgar said in his Annual Report of 1871 (at 12): "The principal support will come from the State, and if any sum is needed to be voted by the township, it will be small * * *."
The 1871 School Law raised significantly the proportion of school costs borne by the State. In 1870, for example, township and district school taxes ($1.45 million) and tuition ($72,000) constituted 90% of the total statewide expenditures ($1.66 million) and the state appropriation was only $100,000. N.J. School Report, 1870, at 11. Thereafter, from 1872 through 1880, state funding averaged 75% of all school costs, exclusive of construction and repairs. Local revenues constituted 23% of current expenses and 40% of all expenditures, inclusive of construction and repair of schools. In fact, during these years many townships and districts raised no school taxes at all. In 1872, for example, 188 of 230 townships and 887 of 1378 districts raised no school tax. N.J. School Report, 1872, at 8.
*267 The State continued for many years to pay a large portion of all school costs, although in 1881 it enacted a law ordering 90% of state school taxes returned to the county of origin, leaving only 10% to be distributed by the State Board equitably. L. 1881, c. 106. However, even under the 1881 law, monies returned to the counties were apportioned to all school districts in accordance with pupil census, so that equalization was achieved at least among pupils of each county. As late as 1910, for example, the state share of current expenses was approximately 67% and was almost equal to the total cost of teachers' salaries. N.J. School Report, 1910, at xv, xvi. This is not to suggest that the Education Clause adopted by the 1875 amendment requires funding of education costs out of general state revenues. This was the ideal sought by the friends of education, as the history demonstrates. Certainly the re-enactment of the Education Clause as part of the 1947 Constitution was not made with the consensus that public education had to be fully funded by the State out of general revenues. A proposal to include such language in the Education Clause was not adopted. "Recommendations of the New Jersey State Federation of Labor," 5 Proceedings of the New Jersey Constitutional Convention of 1947, Appendix, at 893.
The Education Clause was intended to do what it says, that is, to make it a state legislative obligation to provide a thorough education for all pupils wherever located. Landis v. School District No. 44, Camden County, 57 N.J.L. 509 (Sup. Ct. 1895); Society for Establishing Useful Manufacturers v. Paterson, 89 N.J.L. 208 (E. & A. 1916), rev'g 88 N.J.L. 123 (Sup. Ct. 1915). This does not preclude local administration and responsibility. Riccio v. Hoboken, 69 N.J.L. 649 (E. & A. 1903), rev'g 69 N.J.L. 104 (Sup. Ct. 1903), held that school districts may be established for the management and support of schools. See also West Morris Regional Board of Education v. Sills, 58 N.J. 464, 477 (1971). However, the Riccio case held that certain classifications in the School Law of 1902 were unconstitutional because *268 they treated some school districts differently according to unimportant characteristics not germane to the purposes of the law. 69 N.J.L., at 661.
Although districts can be created and classified for appropriate legislative purposes, it was held in the Society for Useful Manufacturers case, supra, that the state school tax remained a state tax even though assessed and levied locally upon local property, with revenues returned by the State to local districts. The court held that prior to the 1875 amendment public schools were a matter of local rather than state concern, but that the amendment made the support of public schools a state concern. 89 N.J.L., at 211.
In Landis v. School District No. 44, Camden County, supra, the court dealt with the constitutionality of that provision of the State School Law which permits local districts to raise sums in addition to the state levy. The court held that the State Constitution does not require "the same means of instruction for every child in the state." 57 N.J.L. at 512. The 1875 amendment was said "to impose on the legislature a duty of providing for a thorough and efficient system of free schools, capable of affording to every child such instruction as is necessary to fit it for the ordinary duties of citizenship; and such provision our school laws would make, if properly executed, with the view of securing the common rights of all, before tendering peculiar advantages to any." The court further held that the Legislature also had power to provide "beyond this constitutional obligation * * * in its discretion, for the further instruction of youth in such branches of learning as, though not essential, are yet conducive to the public service. On this power, I think, rest the laws under which special opportunities for education at public expense are enjoyed."
The word "thorough" in the Education Clause connotes in common meaning the concept of completeness and attention to detail. It means more than simply adequate or minimal. Not adopted was a lower standard of education which had been proposed:
*269 Public schools shall be established and maintained for the gratuitous instruction of all persons in the State between the ages of five and eighteen years, such schools to give rudimentary instruction, and not to fit or prepare scholars for college, or to be controlled by or under the influence of any creed, religious society or denomination whatever. [New York Times, November 24, 1873, at 2:4.]
It is clear from findings made earlier that a "thorough" education is not being afforded to all pupils in New Jersey. However, the Bateman Act would probably afford sufficient financing for a thorough education if that act were fully funded. In an area as difficult and costly as education, the judiciary would not invalidate a statute simply because all the funds necessary to fulfill its objectives were not made available in the first year or two of operation. As the Supreme Court said in the West Morris Regional Board case supra, 58 N.J., at 481, where public monies are involved, "modest objectives must be allowed even though more pervasive ones would be welcome." A statute may not be invalidated "merely because it would also be reasonable to do more." This is not to say that a statute will be left intact without a reasonable expectation that the fundamental constitutional demand for a thorough education will be achieved in the near future. A court would consider at least taking such steps as are necessary to allocate available resources in order to more closely approximate the constitutional demand. As a first step, certainly, the provision affording minimum support aid to each district regardless of wealth and the save harmless provision of the Bateman Act should yield to the state constitutional purpose.
The Bateman Committee sought to justify minimum aid on the ground that it would provide even wealthy districts with the incentive to improve educational programs, and to maintain them at high levels. Bateman Report, at 48-49. The justification offered at trial was that the State "should do something for every district." However, as long as some districts are receiving inadequate education, below that constitutionally required, the reasons offered cannot constitute *270 a valid legislative purpose. As long as some school districts are underfinanced I can see no legitimate legislative purpose in giving rich districts "state aid." I am satisfied by the evidence that a strong reason for minimum aid and save-harmless aid is political, that is, a "give up" to pass the legislation.
I conclude, therefore, that the Bateman Act as presently funded does not meet the state constitutional standard of a thorough education for all. Fully funded, however, with funds to offset inflationary trends, the Bateman Act would probably reach this goal, even in cities with a high AFDC composition. It might also reach the constitutional goal in poorer non-AFDC districts, although they will remain at a disadvantage in competing with wealthy suburbs and AFDC cities in dollars available for good teachers. Accordingly, the Bateman Act will not be invalidated on the ground that at present funding levels it does not provide a thorough education for all. However, the minimum support aid and save harmless provisions cannot be reconciled at this time with the command of the Education Clause.

V. EQUAL PROTECTION OF THE LAWS
* * * all men are created equal * * *  Declaration of Independence. 1776. Each child in the State has the right to an educational program geared to the highest level he is capable of achieving, permitting him to realize his highest potential as a productive member of society.
 The Bateman Report, at 38.
Art. I, par. 1 of the New Jersey Constitution of 1947 provides as follows:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
Our Supreme Court has held that this clause contains an implied guarantee of equality comparable to the Equal Protection *271 Clause of the Fourteenth Amendment. Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 554 (1949); see Bailey v. Engelman, 56 N.J. 54, 55 (1970). Where educational objectives are left primarily to the states, it may be preferable for New Jersey to develop its own rules of equality though they may be more stringent than federal standards. See Booker v. Board of Education, Plainfield, 45 N.J. 161 (1965), dealing with a mandate of the State Commissioner of Education to alleviate de facto segregation in public schools; see also, Jenkins v. Morris Township School District, 58 N.J. 483 (1971).
Inequalities and inadequacies exist under our financing system. Inequalities are inherent in a system where the capacity to raise taxes for school purposes differs according to the wealth of districts.
It is argued that the system is justified by the State's desire to afford local control over education. To what extent local control is real or mythical has been debated in this case. The Bateman Act provides that the Commissioner "shall review each item of appropriation within the budget" of a district whose local tax requirement is less than state formula aid. N.J.S.A. 18A:58-5. There is evidence to indicate that as much as 90% of some current budgets are composed of costs that are more or less fixed or recurring. These include teachers' salaries (which are the largest portion of the budget), pension costs, insurance and debt service costs. See N.J.S.A. 18A:29-4.1 which requires implementation of teacher salary policies and schedules. Most authorities agree that local control, in the sense of hiring teachers, establishing programs, and allocating available resources, is desirable. Beyond common essentials, educational goals should be adjusted to community needs. Also, raising local revenues for school costs may tend toward more efficient use of funds. However, while these purposes may be pursued by appropriate means, local control and responsibility cannot be used to justify a system that breeds substantial disparities in the quality of education. The shortage of funds in some districts *272 actually minimizes local discretion in programming and in the ability to compete for the services of good teachers. School boards in poor districts cannot opt to institute special services when their budgets do not include adequate funds even for essentials. In this sense local control is illusory. It is control for the wealthy, not for the poor.
In theory the Bateman Act goes far toward equalizing the revenue-raising power of local districts. Even for those districts with a large number of AFDC children, however, the Bateman Act equalizes only to a given level. Poor, non-AFDC basic districts in rural areas and suburbs will not be raised even to the state average of equalized valuations. One reason for this is that the $30,000 guaranteed valuation level chosen by the Bateman Committee was based upon the 1965-66 per pupil state median valuation, which was then $32,057. Bateman Report, at 50. The Bateman Act was not adopted until 1970. It became effective July 1971. By this time the statewide average equalized valuation was more than $41,000 per pupil. See Appendix A. Table I, above, shows that there are 208 districts in the State with a total enrollment of 620,000 (approximately 40% of total state enrollment) whose valuations are less than $35,000 per pupil. Excluding the AFDC weighting factor, the remaining districts in the State, with an enrollment of 865,000, can raise school funds as basic districts at lower tax rates than the first group, even after the equalization formula is given effect. Although the AFDC factor will tend to assist those districts with high AFDC populations, the added costs in educating pupils of those districts should offset the gain in state aid. Moreover, there is no assurance that local officials, particularly in type I districts, will use the added aid for improved education by increasing budgets appreciably; they may simply use the aid to help keep tax rates down. Camden, for example, receives state aid of $345 per pupil, plus substantial federal aid (note 13, supra), and still has a current expense budget of only $843 per pupil. The Bateman Act itself reduces incentive equalization aid in proportion *273 to the amount of federal aid received by a district. See definition of "net operating budget." N.J.S.A. 18A:58-2.
The large group of pupils in small, poor districts, in rural areas and elsewhere, with little AFDC population, are likely to derive the least benefit from the Bateman formula, as Table V shows. These "poor" districts with valuations of $30,000 or less per pupil must tax at 3.12% in order to spend $1,200 per pupil as a basic district, under Bateman fully funded. Spending $1,200 per pupil, a basic district with equalized valuation per pupil of $30,000 must raise $936 by local taxes in order to receive $121 in minimum aid (weighted) and $93 in state equalization aid. By comparison, districts with $60,000 in equalized valuations, spending the same amount, have a tax rate of 1.71% and will still receive $121 in minmum support aid.
Even if districts were better equalized by guaranteed valuations, the guarantees do not take into consideration "municipal and county overload." This was a problem which the Bateman Committee recommended to the Permanent Commission for further study. Bateman Report, at 9. Poor districts have other competing needs for local revenue. The evidence shows that poorer districts spend a smaller proportion of their total revenues for school purposes. The demand for municipal services tends to diminish further the school revenue-raising power of poor districts. Another general disadvantage of poor districts is the fact that property taxes are regressive; they impose burdens in inverse proportion to ability to pay. This is because poor people spend a larger proportion of their income for housing. See N.J. Model Cities Report, at 38-40; Guthrie et al., Schools and Inequality, supra, at 186-188.
This is not to suggest that the same amount of money must be spent on each pupil in the State. The differing needs of pupils would suggest the contrary. In fact, the evidence indicates that pupils of low socio-economic status need compensatory education to offset the natural disadvantages of their environment. This is consistent with some comments *274 in the West Morris Regional Board case, supra, 58 N.J. at 477, 478. While that opinion states in dictum that the Equal Protection Clause of the Fourteenth Amendment does not require identical expenditures for all students, and states (at 478) that benefits "may indeed depend upon the district of a student's residence," the court clearly stated that it did not "anticipate the question whether the State statutory scheme may, because of local failures, become unequal to the constitutional promise and command." Ibid., n. 7.
Providing free education for all is a state function. It must be accorded to all on equal terms. Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Public education cannot be financed by a method that makes a pupil's education depend upon the wealth of his family and neighbors as distinguished from the wealth of all taxpayers of the same class throughout the state. Serrano, Van Dusartz and Rodriguez cases, supra, n. 1.
Arthur Wise, Associate Dean, The Graduate School of Education, University of Chicago, first advanced this thesis in "Is Denial of Equal Educational Opportunity Constitutional?" 13 Administrator's Notebook, No. 6 (University of Chicago, Feb. 1965). He elaborated upon it in Rich Schools, Poor Schools (Univ. of Chicago Press Chicago, 1968). It was his contention that the present system of funding education of all states except Hawaii (which is funded entirely out of general state revenues) denies the equal protection of the laws. A similar thesis has been advanced by Coons, Clune and Sugarman, in "Educational Opportunity: A Workable Constitutional Test for State Financial Structures," 57 Cal. L. Rev. 305 (1969), and in Private Wealth and Public Education (The Belknap Press of Harvard University Press, Cambridge, 1970). It is this thesis that has been adopted by the California Supreme Court in Serrano, supra, and by the federal courts in Van Dusartz and Rodriguez, supra.
*275 The New Jersey system of financing public education denies equal protection rights guaranteed by the New Jersey and Federal Constitutions. In support of this conclusion I adopt the thesis of the foregoing authorities. Education is one of the most important functions of state governments, and educational opportunities, where the state has undertaken to provide them, is a right that must be made available to all on equal terms. Brown v. Board of Education, supra. Education is a fundamental interest, vital to the future of every citizen (see Brown, supra; Booker, supra, where our Supreme Court said that "it is during their formative school years that firm foundations may be laid for good citizenship and broad participation in the mainstream of affairs," 45 N.J. at 170-171). Lines drawn on the basis of wealth or property, like those of race, are traditionally disfavored. Harper v. Virginia Bd. of Election, 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Thus, where fundamental rights are asserted under the Equal Protection Clause, classifications will be closely scrutinized. Reynolds v. Sims, 377 U.S. 533, 561-562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Harper case, supra, 383 U.S. at 670, 86 S.Ct. 1079.[20]
No compelling state interest justifies New Jersey's present financing system. It is doubtful that this system even meets the less stringent "rational basis" test normally applied to the regulation of state fiscal or economic matters. See McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). While local control is desirable, discriminations should not be tolerated if they are not necessary for achieving the stated purpose. *276 See Riccio case, supra. A finance system can be devised for New Jersey which affords equal protection to all pupils without precluding local control over public education. The invidious disparities cannot be justified by any overriding state purpose. Distribution of school resources according to the chance location of pupils cannot be tolerated under the State or Federal Constitutions.
The Attorney General contends that two earlier federal cases foreclose consideration of the Fourteenth Amendment equal protection claim: McInnis v. Shapiro, 293 F. Supp. 327 (N.D. Ill. 1968), aff'd mem. sub nom. McInnis v. Oglivie, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 (1969); Burruss v. Wilkerson, 310 F. Supp. 572 (W.D. Va. 1969), aff'd mem. 397 U.S. 44, 90 S.Ct. 812, 25 L.Ed.2d 37 (1970). This contention was rejected by the courts in Serrano, Van Dusartz and Rodriguez, supra, on the grounds that McInnis and Burruss were limited to the assertion of a "needs" test for the distribution of school funds. (The "needs" test was rejected by our own Supreme Court in relation to the distribution of AFDC funds. Bailey v. Engelman, supra, n. 5.) The complaints in McInnis (see Coons et al., Private Wealth and Public Education, supra, at 306) and in Burruss appear broad enough to include the claims made here and in Serrano. Nevertheless, the conclusion that the issue is still open despite the summary affirmances in McInnis and Burruss is confirmed by the more recent action of the United States Supreme Court in Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971).
The equal protection concepts applied here derive from cases that seem to lend themselves more readily to judicial control. See Reynolds v. Sims, supra, asserting the standard of one-man, one-vote; Griffin v. Illinois, supra, holding that an indigent defendant is entitled to a free transcript on appeal; the Harper case, supra, holding that a $1.50 poll tax is an unconstitutional restraint on the right to vote. But one facet of the case at hand does invite a simple standard. Since the State Constitution requires the *277 State Legislature to provide a thorough education for all pupils age 5 to 18, a tax levied to raise revenues for that specific state purpose should be applied uniformly to all members of the same class of taxpayers. Under the present system taxpayers in different districts pay different tax rates for school purposes. To the extent that these revenues fulfill the State's constitutional obligation to provide a "thorough" education, the purpose remains a common state purpose, not a local purpose. (It is noted that there is no comparable provision in our Constitution dealing with municipal services such as police, fire, sanitation, etc.) Accordingly, the "equality" provisions of the State and Federal Constitutions preclude taxing the same class of property at different rates. See Township of Hillsborough v. Cromwell, 326 U.S. 620, 623, 66 S.Ct. 445, 90 L.Ed. 358 (1945); Baldwin Construction Co. v. Essex County Board of Taxation, 16 N.J. 329 (1954); In re Appeals of Kents case, supra, 34 N.J. at 28, 29; Passaic v. Passaic County Board of Taxation, 18 N.J. 371, 381 (1955).
Uniformity in taxation is required by N.J. Const., Art. VIII, § I, par. 1(a), which is as follows:
Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district.
No opinion is expressed here on the relationship of the second sentence of paragraph (a), above, to a statewide tax on real property at a uniform rate for distribution to school districts. This was not an issue in the case. It is clear that some kind of uniform, statewide tax can be adopted by the State to finance "thorough" education without relying on a real property tax. In 1935 the Legislature adopted a sales tax to support school finance reform, but it was repealed within four months. See Bateman Report at 18.
*278 One hundred years ago, after a long struggle, the State adopted the 1871 Free School Law and made the right to a thorough public education a constitutional right. The proposition that the education of a child should be substantially supported by all the citizens of the State prevailed for a time over dissenting voices. The arguments in opposition were answered by State Superintendent Ellis Apgar. He reasoned that the "general diffusion of intelligence is for the general good" of the State, and that equity demands that the expense be paid "by a uniform rate of taxation" on the people as a whole. To those who argued that schools should be supported by a county tax only he replied: the county is simply a subdivision of part of the whole political organization which is the State, and to support schools with county taxes would discriminate in favor of wealthy counties over those that are poor. He noted that some people favored a township tax to support only the schools of their own township and that, even if this were adopted, it would fail to please wealthy taxpayers from whom the objections come. He concluded by saying that if the question "of giving and receiving" is discussed further between two neighbors, one "blessed with children only, and the other with property only" the logic of the argument would compel but one conclusion: "our Public School system must be abolished and every man must educate his own children." N.J. School Report, 1878, at 23, 24.
There is no compelling justification for making a taxpayer in one district pay a tax at a higher rate than a taxpayer in another district, so long as the revenue serves the common state educational purpose.[21] Moreover, education is *279 too important to the State as well as the children of the State to be largely controlled by the haphazard distribution of real property wealth. The State and its courts have a special solicitude for the welfare of children since they have little control over their own destinies. Children may become wards of the court simply to insure that they be provided with "proper protection, maintenance and education." N.J.S.A. 9:2-9; N.J.S.A. 2A:4-2; see State v. Perricone, 37 N.J. 463, 476 (1962). Education is not left to the discretion of a parent. By statute every parent is compelled to have his child between ages 6 and 16 attend schools. The public school that he attends is entirely the creation of state laws. As was said in Van Dusartz, supra,
What is important to note is that the objection to classification by wealth is in this case aggravated by the fact that the variations in wealth are State created. This is not the simple instance in which a poor man is injured by his lack of funds. Here the poverty is that of a governmental unit that the State itself has defined and commissioned.
Education serves too important a function to leave it also to the mood  in some cases the low aspirations  of the taxpayers of a given district, even those whose children attend schools in the district. The uncertainty of raising sufficient local funds for school purposes is the very hazard that the uniform state tax was designed to meet under the Free School Law of 1871. As State Superintendent Apgar stated then, "By this change our school system is, for the first time in its history, placed upon a sure and substantial basis. Our schools will no longer depend for their support upon a fund which a mere majority at a town meeting may any year withhold." The Education Clause and the equality provisions of the New Jersey Constitution require a more certain and uniform basis than our statutory scheme now provides for the thorough education of each child.
For the foregoing reasons I hold that the statutes of New Jersey do not provide the equality of educational opportunity *280 which is demanded by our State Constitution. In my opinion the statutory scheme also violates the Equal Protection Clause of the Fourteenth Amendment.

VI. CONCLUSION
The present system of financing public elementary and secondary schools in New Jersey violates the requirements for equality contained in the State and Federal Constitutions. The system discriminates against pupils in districts with low real property wealth, and it discriminates against taxpayers by imposing unequal burdens for a common state purpose. The State must finance a "thorough and efficient" system of education out of state revenues raised by levies imposed uniformly on taxpayers of the same class. The present equalizing factors in the law are not sufficient to overcome inequities in the distribution of school funds and tax burdens.
The present financing system is declared unconstitutional; but this declaration shall operate prospectively only and shall not prevent the continued operation of the school system and existing tax laws and all actions taken thereunder. This declaration shall not invalidate past or future obligations (such as school bonds, anticipation notes, etc.) incurred under the provisions of existing school laws and tax laws. Said laws shall continue in effect unless and until specific operations under them are enjoined by the court. See Switz v. Middletown Tp., supra, 23 N.J. at 598-599; Ridgefield Park v. Bergen County Board of Taxation, 33 N.J. 262, 266 (1960). To allow time for legislative action, such operations shall not be enjoined prior to January 1, 1974, except that if a nondiscriminatory system of taxation is not enacted by January 1, 1973, then from and after that date no state monies shall be distributed to any school districts pursuant to the "minimum support aid" provisions and the save-harmless provisions of the Bateman Act (L. *281 1970, c. 234) which have been identified previously in this opinion. All funds that are thereby set free shall be distributed by appropriate state officials in a manner that will effectuate as far as possible the principles expressed herein; more specifically, these funds shall be applied to raise guaranteed valuations to the highest level that a proportionate distribution of funds will permit, utilizing the remaining provisions of the Bateman Act.
The court will retain jurisdiction for such modification or further order as may be required. See Switz v. Middletown Tp., supra, 23 N.J. at 598-599, 614.
Nothing herein shall be construed as requiring the Legislature to adopt a specific system of financing or taxation. The Legislature may approach the goal required by the Education Clause by any methods reasonably calculated to accomplish that purpose consistent with the equal protection requirements of law.
While equalizing tax burdens may be readily accomplished by known means, it may be more difficult to assure that additional school funds will actually result in improved education. No purpose would be served by simply bidding up the cost of the same services without the expectation of improvement. Education must be raised to a "thorough" level in all districts where deficiencies exist. The Legislature, the State Board, the Bateman Committee, educators in this State have defined this goal in commendable terms. See Part I, above. The State Board and the Commissioner have ample statutory power to measure progress and to enforce this mandate by rule and regulation. Equalizing the tax burden in support of these purposes is a more certain goal. The New Jersey Constitution demands that both goals be attained.
An appropriate order for judgment shall be submitted. It shall include specific provisions to assure the validity and enforceability of past and future acts and obligations incurred under existing laws as long as they remain operative.
*282 
*283 
*284 
*285 
NOTES
[1] Serrano v. Priest, 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241 (Sup. Ct. 1971); Van Dusartz v. Hatfield, 334 F. Supp. 870 (D. Minn. 1971); and Rodriguez v. San Antonio Independent School District, 337 F. Supp. 280 (W.D. Tex. 1971).
[2] Richard F. McCarthy of the Township of Berlin joined as a party plaintiff in lieu of proceeding with a similar action in Camden County. Counsel for plaintiffs in a recently commenced action in Monmouth County, Loeb v. Rover, filed a brief here as amicus curiae.
[3] Plaintiffs had also asserted a claim of de facto discrimination based on race or color, seeking changes in school district boundaries. This aspect of the case was severed by stipulation and will be dismissed voluntarily, but without prejudice, if plaintiffs' principal attack on the financing system is upheld. A similar claim was asserted in Spencer v. Kugler, 326 F. Supp. 1235 (D.N.J. 1971). The court dismissed that action and the United States Supreme Court summarily affirmed on January 17, 1972, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723, Douglas, J., dissenting. Part of this case is still on appeal in the Third Circuit Court of Appeals.
[4] L. 1970, c. 234, enacted October 26, 1970, effective July 1, 1971. This law adopted most of the recommendations of the State Aid to School Districts Study Commission, whose chairman was State Senator Raymond H. Bateman of Somerset County. The Commission's report, dated December 19, 1968, is referred to as the Bateman Report. The Commission was created by L. 1966, c. 32. There is now a Permanent Commission on State School Support, L. 1970, c. 233, N.J.S.A. 52:9N-1 et seq.
[5] Bailey v. Engelman, 56 N.J. 54, 56 (1970), describes the nature and statutory basis of the AFDC program.
[6] Other significant state appropriations in 1971-72 going toward local school costs are approximately $116 million for the teachers' pension fund and $30.5 million for school building aid.
[7] Brown, Stuart G., ed., We Hold These Truths 114-116 (Harper & Brother, New York: 1941).
[8] The board of school estimate is composed of the mayor and two other members of the municipal governing body and two members of the board of education. N.J.S.A. 18A:22-1.
[9] By 1969 approximately 75% of all type I districts had school budgets which exceeded 1-1/2% of assessed valuations. New Jersey Urban School Development Council, The Status of Equal Educational Opportunity in New Jersey's Model Cities, at 202, hereinafter referred to as N.J. Model Cities Report.
[10] An early phase of this action concerned Jersey City's 1970-71 budget. The governing body had provided a "caretaker" budget which did not include money for teachers' salaries. An appeal was taken by the board of education to the State Commissioner of Education. He raised the budget to the amount originally requested by the local board. This court then entered an order, on defendants' application, compelling Jersey City to raise its share in accordance with the mandate of the Commissioner.
[11] Data in columns 1, 2 and 7 was furnished by the State Department of Education; data in columns 10 and 11 comes from records of the State Department of Education; column 3 was compiled from data in the Nineteenth Annual Report of the Commissioner, and columns 4, 5, 6, 8 and 9 are from the NJEA Bulletin.
[12] Winfield Township was studied in 1946 by Robert K. Merton, Patricia S. West, and Marie Jahoda of the Bureau of Applied Social Research, Columbia University. It was chosen because of the intense community and political life of its residents which developed in part by choice and in part because of problems confronting them at the outset. The following description of its origins is taken from this study entitled, "Patterns of Social Life  Explorations in the Sociology and Social Psychology of Housing."

Winfield Township was built as a mutual ownership community with federal funds furnished under the Lanham Act. It was a "workers community" sponsored by an industrial union of shipyard workers in cooperation with the Federal Works Agency.
The development encompassed approximately 110 acres. Originally there were 700 families housed in 250 buildings, most of which were 3 or 4-unit, flat-roofed structures, and approximately 75 were single and two-family homes. When Winfield Township was first settled it had no school and its children were taken by bus to nearby districts whole limited facilities made them unwelcome.
The study states that nearby municipalities did not want to assume the cost of providing community or municipal services. The study concludes that Winfield Township, therefore, was "gerry-mandered" by the Legislature into an independent township that had to develop its own government and municipal services.
[13] Total federal aid for district programs as well as state administration was about $95 million in 1970-71, plus $12 million for areas affected by federal activity. The largest segment was in Title I funds (Elementary and Secondary Education Act of 1965, Title I, Public Law 89-10, as amended), $43 million in statewide total.

Examples of municipalities receiving substantial amounts of Title I funds are (in thousands):

 Atlantic City .................. $1,165 Morristown ............. 101
 Camden ......................... 2,660 Newark ................. 9,046
 Deptford ....................... 116 North Brunswick ........ 581
 East Orange .................... 631 Orange ................. 289
 Elizabeth ...................... 891 Passaic ................ 587
 Englewood ...................... 196 Paterson ............... 2,286
 Franklin Tp. ................... 173 Perth Amboy ............ 406
 Jersey City .................... 2,787 Phillipsburg ........... 114
 Hoboken ........................ 710 Plainfield ............. 452
 Lakewood ....................... 302 Pleasantville .......... 238
 Long Branch .................... 389 Salem .................. 135
 Millville ...................... 163 Trenton ................ 1,706

[14] The report concludes:

That schools bring little influence to bear on a child's achievement that is independent of his background and general social context; and that * * * the inequalities imposed on children by their home, neighborhood, and peer environment are carried along to become the inequalities with which they confront adult life at the end of school. For equality of educational opportunity through the schools must imply a strong effect of schools that is independent of the child's immediate social environment, and that strong independent effect is not present in American schools. [at 325]
[15] It may well be that part of the Coleman Report must be given effect and that to equalize educational opportunity significantly de facto segregation of minority pupils must be overcome in addition to equalizing funds and facilities.
[16] Mollenkopf and Melville, "A Study of Secondary School Characteristics as Related to Test Scores," (Research Bulletin 56-6, 1956, mimeo).
[17] The School Building Aid Law was also amended by the Bateman Act. This aid, for debt service and capital outlay (as well as capital reserve fund), was amended to include the same weighting basis per pupil (including the AFDC factor), but not to exceed $45 per weighted pupil in resident enrollment, and subject to a local share equal to $.075 per $100 of equalized valuations. This law is also subject to the 20% funding provision. N.J.S.A. 18A:58-18.1. Under the "emergency" Building Aid Law of 1968 (L. 1968, c. 177, as amended by L. 1969, c. 136, L. 1970, c. 125 and L. 1971, c. 10) an additional sum not exceeding $25 per pupil is also available for debt service only for those districts found by the State Board of Education to be incapable of providing necessary school facilities (N.J.S.A. 18A:33-1) to satisfy the school laws. N.J.S.A. 18A:58-33.2 et seq. In 1972-73 building aid ($29.7 million) and emergency aid ($7.4 million) will approximate 27% of the annual debt service costs on local districts.
[18] The weighting factor of 1.434 was derived by averaging current Jersey City and Camden enrollments and AFDC population figures. Camden's enrollment of 20,436 is increased by units for AFDC children (which adds 10,588 units) and units for grade levels, to a total weighted enrollment of 32,572. Jersey City's enrollment is approximately 39,000; its AFDC factor adds 10,642 units; the total weighted enrollment is 52,328. The average weighted enrollment in Jersey City and Camden combined is 1.434 units per resident pupil.
[19] The save-harmless clause guarantees that "no school district shall be apportioned for minimum support aid, incentive equalization aid and county vocational school aid an amount less than the per pupil aid, excluding transportation aid and atypical aid, it received for the State fiscal year 1970-71."
[20] See also, in general, Note "Development in the Law  Equal Protection." 82 Harr. L. Rev. 1065 (1969), and Michaelman, "On Protecting the Poor Through the Fourteenth Amendment," 83 Harv. L. Rev. 7 (1969).
[21] If monies are supplied to local districts from general state revenues sufficient for a "thorough" education, some districts may still desire to add to that sum by local property taxes. This may reintroduce inequities of various sorts; however, the issue was not argued, and my decision is not intended to reflect upon it. See Landis case, supra.